IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CAROLYNE KIGERA,

    Plaintiff,

v.                                                  Case No. 16-2547-JTM

BETHESDA LUTHERAN COMMUNITIES,

    Defendant.

## MEMORANDUM AND ORDER

Plaintiff Carolyne Kigera asserts Title VII claims for race/national origin discrimination and unlawful retaliation against her former employer Bethesda Lutheran Communities ("Bethesda"). The matter is now before the court on Bethesda's motion for summary judgment (Dkt. 41). For the reasons stated herein, the court finds that the motion for summary judgment should be granted.

**I. Uncontroverted Facts**

Bethesda is a nonprofit organization and Christian social service charity that operates homes for persons with intellectual and developmental disabilities. Bethesda maintains a business office 14150 West 113th Street, Lenexa, Kansas, 66215. Carolyne Kigera is an African-American of Kenyan national origin. In 2011, Bethesda hired Kigera as a licensed practical nurse (LPN) at its Lenexa location.

Bethesda maintains an EEO policy, the Fair Treatment and Problem Resolution Procedure and Anti-Harassment Policy, in its Employee Handbook, which prohibits

discrimination on the basis of race, race/national origin, prohibits retaliation, and provides a procedure for employees to make reports of discrimination.

Kigera began employment with Bethesda in 2011 as a Licensed Practical Nurse (LPN) at Bethesda's campus in Lenexa, Kansas, and worked as an LPN (except for a couple of shifts) to the end of her employment. While employed at Bethesda, Kigera received training through the American Red Cross First Aid/PR participant manual. The manual provides direction to obtain emergency services by calling 911 if the caregiver thinks that a person has suffered a head injury.

Bethesda also maintains an organization-wide Change In Condition policy, which was issued in March 2014 and which has been in place since that time. The policy, which consists of four pages, was provided to all organization staff in Lenexa, including Kigera. Kigera received the policy and training on the policy in March 2014 and June 5, 2014. The policy provides in part that injuries to the head are considered medical emergencies:

> FOR MEDICAL EMERGENCIES CALL EMS (911) and initiate First Aid or CPR as necessary. Examples of medical emergencies include (not an exhaustive list): The individual … has injuries to the head….

The policy provides that unwitnessed falls are considered serious medical issues and require the individual to be sent to the Emergency Room or Urgent Care. The policy states:

> FOR A SERIOUS MEDICAL ISSUE that requires prompt medical attention, assist and transport the individual to the Emergency Room or Urgent Care. These issues include the following (not an exhaustive list): … unwitnessed fall….

2

Kigera testified she does not believe an injury to the head or an unwitnessed fall is a medical emergency or serious medical issue. She does not believe an unwitnessed fall that results in an injury to the head should require her to contact emergency medical services.

On February 19, 2015 while Kigera was on duty, a resident[1] at Bethesda — "RW" — had an unwitnessed fall that resulted in a hematoma to his head. On February 23, 2015, Kigera signed a statement regarding the incident as follows:

> At about 5pm called to the hallway outside SleepMed's room because [RW] was found on the floor there. When I arrived he was still on the floor — I went into the bathroom to get gloves and when I returned he was trying to stand up. I, Anthony (DSP) [Direct Support Professional] and Solomon (DSP) helped him to a standing position and walked with him to the bathroom. While in the bathroom I did my assessment — he was verbally responsive, his range of motion was fine, checked his pupils, and looked for injury. There was a small area on the back of his head (see nursing note 2/19/15 5pm). No treatment was deemed needed at that time. At this time I started the neurological flow sheet and checked him periodically throughout the evening. Around 10pm I saw [RW] throw-up in the common area of the house. I immediately called the doctor — I believe on my cell phone. The doctor ordered that he be sent to the ER. A staff person (DSP) took him to the ER. The final neurological assessment on the flow sheet was completed after [RW] threw up and it was noted that his blood pressure was somewhat elevated. During the time period between the fall and the time he threw up he was acting normally — walking around, talking to people, he ate his dinner. No one noted any concerns to me during this period.

The injury to RW on February 19, 2015, resulted in brain bleeding and a traumatic brain injury. RW was in the hospital as a result of the fall until March 31, 2015, when he returned to Bethesda.

---

[1] Bethesda's documents refer to its residents as "persons served."

An incident report prepared by Catherine Malinda stated, based upon a statement from DSP Ebenezer Agyapong, that the nurse "quickly performed the normal procedure before she got [RW] up from the floor," and that her response was "fantastic" because "in less than one minutes she was present to performed her procedure and ok him to got up and mr. [RW] did." [grammatical errors in original].

An initial investigative report on the February 19 incident was conducted by Jerilynn Anderton, the Regional Quality Enhancement Director for Bethesda, from February 23 to February 26, 2016. The inquiry was made to determine whether there was negligence on the part of Bethesda staff for not ensuring that RW was taken to the emergency room immediately after the injury. Her report describes the incident as occurring when another resident knocked RW down (as shown on video); it states that RW was discovered by staff within three minutes; that Kigera was brought immediately to assess RW and noted he had hit his head; Kigera initiated a neuro check which continued from the event throughout the evening until 10:30 p.m., when RW threw up; the physician was called and instructed that RW be taken to the hospital; and RW was taken the hospital where it was discovered that he had bleeding on the brain.

Anderton's report includes the aforementioned statement of the incident signed by Kigera. (*See* Pp. 3-4, *supra*). Kigera contends the description is incomplete because she contends she made two calls to Bethesda's on-call doctor that evening, with the first call occurring at some point between 5 p.m. and 9 p.m. Kigera said she cannot remember when that call took place. She contends the doctor told her at that point to monitor the patient and send him to the ER if there was any change in condition. She

4

testified she called the doctor a second time after RW threw up. She says she signed the statement in Anderton's report because Anderton told her to sign it.

Anderton's report concluded that "[n]eglect is not substantiated for this incident," stating that RW was discovered immediately, "a neurological check was put into place with observations occurring regularly through the evening," and RW acted normally after the incident until he threw up five hours later.

From March 30 to April 2, 2015, Bethesda Corporate Nursing Director Elizabeth Gifford was present at Bethesda's Lenexa campus. Her job includes reviewing nursing practices and overseeing the training of nursing practices. Gifford knew RW from a prior visit and was familiar with his medical condition. In her opinion, RW had experienced a significant decline in function after the fall, for example he needed assistance in walking. Gifford said as a result of her observations, she conducted a nursing review of the February 19 incident. Gifford notes that the initial investigative report was done by Jeri Anderton, who is not a nurse or licensed health care professional, and Gifford believes Anderton did not understand or appreciate the significance of what Gifford concluded was a failure to follow nursing protocol during the incident. Gifford states in an affidavit that at the time of her review, she was unaware of and was not involved in any way in any discrimination complaint by Kigera. Gifford's report asserted that under the LPN core curriculum on emergency response to a suspected head injury, basic measures include not moving the person and seeking emergency health services. It asserts that the Red Cross First Aid/PR participant manual also provides direction to obtain emergency services by calling 911

for any suspicion of head injury, and noted that Kigera's attendance records show she attended training on this course. Gifford concluded that Kigera "failed to follow prudent nursing practice to seek prompt emergency health care for the suspicion of head injury" and that she "failed to notify RN or Management regarding possible head injury." Gifford determined there was a six-hour delay in obtaining treatment and that RW suffered a decline in function due to the injury. Gifford recommended review of Kigera's performance to determine if it met the Kansas definition of "neglect" and follow up on what she termed the LPN's substandard performance.

As a result of Gifford's review, Bethesda placed Kigera on administrative leave. On April 23, 2015, Bethesda advised Kigera of her termination, with the explanation that it was because Kigera had not followed nursing protocol.

Kigera does not know but was told that a Caucasian LPN was hired to replace her at Bethesda following her termination. In fact, Joel Chege (African-American and of Kenyan origin) and Sunpreet Toor (Asian-Indian) assumed Kigera's LPN hours at Bethesda.

Bethesda currently employs two LPNs in Lenexa: Josephat Kenner and Maxwell Kimathi, both of whom are African-American and of Kenyan national origin. Bethesda currently employs 104 persons at its Lenexa facility. Eighty of these employees are African-American. Over fifty of the employees are of African national origin.

On May 7, 2015, Kigera filed a charge of discrimination with the EEOC alleging that she was discriminated against for reasons including her race, color, national origin, and retaliation for complaining about discriminatory practices.

Kigera believes LPN Jane Eyerly (Caucasian), nurse Catherine Malinda (African-American and Kenyan), and nurse Stephanie Moss (African-American) did not follow nursing protocol but were treated more favorably than Kigera.

Kigera believes Eyerly and Moss were present when a resident ("C") fell in October 2014, and C was not sent to the emergency room. According to Bethesda's uncontroverted evidence, the October 2014 incident was witnessed and did not result in injury or require that the resident be sent for medical treatment.

Kigera points out that Malinda had a resident fall on April 8, 2015, and the person was not sent for emergency care. Bethesda's uncontroverted evidence is that the fall was witnessed, that it did not involve a head injury, and that the person was taken to the doctor shortly after the incident.

Both LPNs and DSPs are required by law to report instances of abuse and neglect. In July 2014, Kigera reported alleged abuse of a resident by DSP Barbara Bonnel (Caucasian) to Bethesda's Director of Nursing Stephanie Moss (African-American) and Human Resources Manager Willetta Proctor (African-American). Bethesda investigated the report but found it could not be substantiated.

Kigera contends that unlike Bonnel, DSP Samuel Kasina (Kenyan) was immediately terminated for taking a pair of underwear from a patient's mouth. Bethesda's evidence, which plaintiff fails to genuinely controvert,[2] is that Kasina was

---

[2] Plaintiff's deposition shows she had no personal knowledge of some of the incidents she cited as proof of differential treatment.

terminated after an investigation found he had slapped a resident's hand and forcefully grabbed her arm.

Kigera contends a Caucasian DSP named "John White" engaged in abuse and was not terminated. Kigera cites no competent evidence to substantiate the contention. Bethesda cites uncontroverted evidence that it did not employ a "John White," but that a DSP named John Ludwig was terminated in December 2014 after an investigation found he had grabbed and jerked a resident.

On November 26, 2014, Area Director Crystal Engel sent an email to Kigera regarding her time card. It asserted Kigera had not clocked in and out correctly and stated that the email "serves as a verbal counseling and will be kept on file." On December 8, 2014, Kigera sent an email to Human Resources Director Michael Hoffman complaining that Engel was harassing her and complaining that she was being discriminated against because of her race and origin.

Kigera's December 8 email, along with an anonymous complaint and a complaint from Tonisha Wills (African-American), was referred to an outside (non-Bethesda employee) investigator, Ann Molloy, for investigation. Molloy prepared a preliminary and supplemental report (Dkt. 42-6). In those reports, Molloy noted that non-managerial employees, most of whom were black, felt they were subjected to a harsher standard of scrutiny than white employees. She noted many non-managerial employees believed the incident involving Samuel Kasina had not been fully investigated and that his termination was predetermined, whereas they believed similar allegations of abuse against white employees Bonnie Bonnel and John Ludwig were

8

treated differently. Molloy said a review of the files showed that a full review of Kasina's case took place and the incident was substantiated by a witness. She also noted that Bonnel's incident was inconclusive and included testimony of an African employee who reported seeing no evidence of abuse. In Ludwig's case, he had self-reported one incident and was terminated after a second incident. Molloy addressed a number of other issues in her report but ultimately concluded that Kigera had not been treated differently on account of her race, national origin, or as a result of retaliation.

Tonisha Wills, the other employee who made a complaint in 2014, remained employed at Bethesda until December of 2016.

## II. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III. Summary of Arguments

Bethesda contends Kigera cannot establish a prima facie case of race or national origin discrimination because she fails to show that any similarly situated employee was treated differently than her under circumstances giving rise to an inference of discrimination. (Dkt. 42 at 22-24). Moreover, it contends Kigera has failed to cite evidence that Bethesda's explanation for the termination was a pretext for discrimination. (*Id*. at 25). It makes similar arguments with respect to Kigera's retaliation claim, arguing there is no prima facie case because Kigera's termination was too remote from her complaint of discrimination, and again asserting that Kigera shows no evidence of pretext as to Bethesda's rationale for the termination.

Kigera argues that a prima facie case of discrimination is shown by evidence that Jane Eyerly, who is white, received more favorable treatment than Kigera after a resident (CA) fell in October of 2014, and after committing what Kigera contends were nursing protocol violations, namely giving narcotics to an employee (Tony Jones) not licensed to handle them and having a patient's narcotics go missing. (Dkt. 51 at 9-10). Kigera contends evidence of pretext arises from Gifford's "alleged nursing audit," from Kigera's testimony that she did not violate any nursing protocol and that she complied with Bethesda's Change In Condition policy, as well as from her testimony that she called a physician after RW fell and she complied with the doctor's directive to monitor the patient for a change in condition. Kigera also contends the Red Cross manual cited by Bethesda supports her position, because it indicates a head injury may be suspected where the person fell "from greater than a standing height," and it says "if you think a

10

person has a head … injury, call 911," which Kigera contends "is totally discretionary." (Dkt. 51 at 12). Kigera contends evidence of pretext also arises because Gifford's conclusion that Kigera failed to follow nursing protocol directly contradicts the conclusion of Jeri Anderton, thus creating a genuine issue of fact. (*Id*. at 13-14).

As for retaliation, Kigera argues there was a causal connection between her complaint of discrimination and the termination because "the record shows that plaintiff was meeting with defendant's outside investigator and voicing her opposition to defendant's discriminatory practices." (Dkt. 51 at 17).

**IV. Discussion**

1. Race/National Origin Discrimination. Under Title VII, it is unlawful for an employer "to discharge any individual … because of such individual's race, color … or national origin." 42 U.S.C. § 2000e-2(a)(1). In the absence of direct evidence of discriminatory intent, a Title VII violation can be proved with circumstantial evidence. *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). In analyzing such claims, the court uses the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case of discrimination. If plaintiff does so, the employer must then identify legitimate, nondiscriminatory reasons for its action. Finally, if the employer meets that burden, the plaintiff must then establish that the employer's articulated reason was a pretext to mask unlawful discrimination. *McDonnell*, 411 U.S. at 802–04.

A plaintiff can make a prima facie case of discrimination by showing three elements: that she is a member of a protected class, that she suffered an adverse

11

employment action, and that the challenged action occurred under circumstances giving rise to an inference of discrimination. *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015). The only element in dispute here is the third one. A plaintiff can meet that element by showing that the employer treated similarly situated employees differently. *Jones v. Denver Post Corp.*, 203 F.3d 748, 753 (10th Cir. 2000). *See Mitchell v. Kansas City Kan. Sch. Dist.*, \_\_\_F.App'x\_\_\_, 2017 WL 5151688, *2 (10th Cir. Nov. 17, 2017).

In asserting that she was subjected to differential treatment on account of her race and national origin, Kigera cites an incident involving LPN Jane Eyerly in October of 2014, when a resident fell, but Eyerly was not disciplined or terminated. The uncontroverted facts surrounding that incident, however, are that the person's fall was witnessed, it did not did not result in injury, and it did not require that the person be sent for medical treatment. By contrast, the fall involving RW was unwitnessed and it resulted in an observed injury (hematoma) to the head. Bethesda cites uncontroverted evidence that its Change In Condition policy in effect at the time stated that injuries to the head were considered a medical emergency for which emergency medical services should be called. It also stated that unwitnessed falls were considered a serious medical issue calling for medical attention and transport to the emergency room or urgent care. The American Red Cross First Aid/PR participant manual also provided direction to obtain emergency services by calling 911 for any suspicion of a head injury. Because the fall of the resident with Eyerly in October 2014 differed in these material respects from the fall of the resident with Kigera in February 2015, the incident is not comparable and

does not reasonably give rise to an inference that Kigera was treated differently on account of her race or national origin.

Kigera also alleges that Eyerly committed nursing protocol violations involving the handling of narcotics. Kigera testified in her deposition that on one occasion, "narcotics were missing … [and] Jane Eyerly was the last person to administer that medication." (Dkt. 42-8 at 25). On another occasion, Eyerly "took narcotics and handed them to an employee by the name Tony Jones to take to the main house…." (*Id*. at 25-26). Kigera testified that "we reported these incidents and [Eyerly] was never fired." Again, Kigera fails to cite evidence that these incidents were comparable to her situation. She cites no nursing protocols violated by Eyerly, nor does she cite evidence that such actions were comparable in seriousness to failing to follow protocols for a head injury. Kigera fails to cite differential treatment of LPNs who engaged in actions similar to hers. In sum, the court concludes that Kigera has failed to cite evidence establishing a prima facie case of race or national origin discrimination.

Even if Kigera had met her burden on that point, she fails to cite evidence showing a genuine issue of fact as to whether Bethesda's stated reason for the termination was a pretext. A plaintiff demonstrates pretext by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colo. Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005). In attempting to show pretext, Kigera first cites the fact

that Bethesda "was in possession of Elizabeth Gifford's alleged nursing audit" when it suspended Kigera. (Dkt. 51 at 11) The court assumes this is meant to suggest an inference of pretext arises from the fact that Bethesda conducted a nursing review. But Gifford's uncontroverted affidavit asserts that her duties included responsibility for nurse training, and Kigera cites no evidence from which one could reasonably infer that conducting a nursing review in an instance where a nurse's actions may have contributed to a resident's injury was so out of the ordinary as to suggest pretext. Kigera next cites her own testimony that Bethesda announced a policy after her incident that all falls, whether witnessed or unwitnessed, should result in transportation to the emergency room. Even if true, however, Kigera fails to explain how this suggests pretext. Kigera also asserts that her testimony that she did not violate any nursing protocols and complied with Bethesda's policies shows that Bethesda's explanation is a pretext. But the uncontroverted evidence shows Kigera did not comply with Bethesda's policy to call emergency medical services in the event of an unwitnessed fall and/or a head injury, and Kigera's conclusory declarations to the contrary do not create a genuine issue of fact. And even accepting Kigera's testimony that she called the on-call physician at some point after RW's fall, Kigera fails to cite evidence that this alleged phone call occurred promptly after the fall. Moreover, the uncontroverted facts show that Kigera did not comply with the protocol for keeping the person from moving and seeking emergency medical care in the event of a head injury.

Kigera also asserts that she did not see any decline in RW's level of function after his return from the hospital,[3] which (she argues) suggests Gifford's conclusion to the contrary and her nursing review were a pretext. In determining whether a proffered reason was pretextual, the court "examine[s] the facts as they appear to the *person making the decision*" and does not "look to the plaintiff's subjective evaluation of the situation." *Depaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017) (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, (10th Cir. 2011)) (emphasis in *Depaula*). The relevant inquiry "concerns the belief of the employer that the employee engaged in misconduct, not whether the actual facts, as shown by evidence extrinsic to the employer's assessment, may have been otherwise." *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1178 (10th Cir. 2005). Kigera's vague assertions about RW's condition — in which she could "not recall" changes or could not "say any specific declines" —fail to raise any genuine issue of fact as to whether Gifford genuinely believed there was a decline in RW's condition after he suffered a traumatic brain injury and an extended stay in the hospital. Nor does it raise any inferences of pretext concerning Gifford's belief that

---

[3] Kigera's deposition (Dkt. 42-2 at 32-33) included the following:
Q. And when Mr. [RW] returned, isn't it correct that he had some severe injuries and had a substantial decline in his ability to walk and other things?
A. He was still walking when he came back.
Q. Okay. But he had a big decline in his health condition due to that fall, correct?
A. I don't recall the changes.
Q. Did you notice any decline in Mr. [RW's] ability to function from February 19 until the next time you saw him in March of 2015?
A. I can't say any specific declines that I recognized at that time.
Q. Did you see Mr. [RW] when he returned?
A. Yes.
Q. And you're saying you didn't recognize that there was a decline?
A. No specific decline that I can actually say.

15

Kigera did not follow proper nursing protocol after the fall.[4] Similarly, Kigera cites no evidence raising a genuine issue as to the declaration of Laura Radueg, Bethesda's Regional Human Resources Director, who along with Bethesda corporate officers Mark Wester and Mike Hoffman made the decision to terminate Kigera's employment. Radueg asserts that their action was based on a belief that Kigera's response to RW's fall was not proper and out of concern over potential liability and licensure issues. In sum, Kigera has failed to identify competent evidence in the record showing a genuine issue of fact on the question of pretext. Bethesda is accordingly entitled to summary judgment on Kigera's claim for race and national origin discrimination.

2. <u>Retaliation</u>. Title VII makes it unlawful for an employer to retaliate against an employee because she has opposed any practice made unlawful by those statutes. 42 U.S.C. § 2000e–3(a). Kigera contends she was terminated in retaliation for making complaints of race and national origin discrimination.

The court examines the retaliation claim using the same *McDonnell Douglas* framework. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). A plaintiff can make a prima facie case of retaliation by showing: (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action. *Id.*

---

[4] The court rejects plaintiff's argument that Gifford's testimony is inadmissible because she was not designated as an expert witness. Gifford's testimony is based upon her personal knowledge of the relevant events as an employee of Bethesda and it recounts the historical facts surrounding Kigera's termination. Merely because Gifford's opinions factored into these events does not convert her into an expert witness and does not subject her testimony to exclusion under Fed. R. Evid. 702.

(quoting *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008)). If the plaintiff presents a prima facie case of retaliation, then defendant must respond with a legitimate, nonretaliatory reason for the challenged action. *Debord v. Mercy Health Sys. of Kansas, Inc.*, 737 F.3d 642, 656 (10th Cir. 2013). Plaintiff then must establish that defendant's stated reason is pretextual. *Id.*

Bethesda contends Kigera has failed to show any evidence of a causal connection between her complaints and her termination, because there was a four-month lapse between her December 2014 complaint and the April 2015 termination. But there is evidence that Kigera participated in the investigation of her complaint and gave statements to the investigator on more than one occasion, including shortly before her termination. (Dkt. 42-6 at 3). Given that time frame, and viewing all inferences in plaintiff's favor, the court finds plaintiff has shown sufficient temporal proximity to establish a prima facie case of retaliation. But for the same reasons discussed above,[5] the court concludes Kigera has failed to cite evidence showing a genuine issue of fact as to whether Bethesda's stated reason for her termination was a pretext for retaliation.

The uncontroverted facts show that Bethesda terminated Kigera's employment based on a belief that Kigera did not follow proper protocol after RW's fall. Kigera's subjective beliefs that she did not do anything wrong and was treated unfairly are not sufficient to create a genuine issue. To support an inference of pretext, a plaintiff "must come forward with evidence that the employer didn't really believe its proffered

---

[5] Kigera's brief does not actually discuss pretext with respect to the retaliation claim (Dkt. 51 at 17), so the court assumes she relies on the same arguments previously discussed concerning pretext.

reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (quoting *Johnson v. Weld Cty.*, 594 F.3d 1202, 1211 (10th Cir. 2010)). And in making that determination, the court examines the facts as they appeared to the person making the employment decision. Under those standards, the uncontroverted facts do not give rise to a genuine issue of pretext arises as to Bethesda's stated reason for the termination.

**IT IS THEREFORE ORDERED** this 26th day of January, 2018, that Bethesda's Motion for Summary Judgment (Dkt. 41) is GRANTED. Plaintiff shall take nothing on the claims, and the action is hereby dismissed on the merits.

    ___s/ J. Thomas Marten_____
    J. THOMAS MARTEN, JUDGE